* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms with some modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between Plaintiff and Defendant-Employer at all relevant times herein.
3. Plaintiff was injured by accident on 9 April 1997.
4. Compensability has been admitted.
5. There is no question as to misjoinder or nonjoinder of any party.
6. Builder's Mutual Insurance Company was the carrier on the risk at all relevant times.
7. Plaintiff had been paid temporary total disability benefits in this case since the date of injury through 18 January 2005. Said payments were discontinued on 18 January 2005, pursuant to Special Deputy Commissioner Elizabeth "Lacy" Maddox's 22 March 2005 Administrative Decision and Order which approved Defendants' Form 24 application filed 18 January 2005.
8. The following items were stipulated into evidence:
 a. The Pre-Trial Agreement marked as stipulated exhibit 1.
 b. Industrial Commission Forms marked as stipulated exhibit 2.
 c. Medical records marked as stipulated exhibit 3.
 d. The Form 24 application and supporting documentation marked as stipulated exhibit 4.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the date of the hearing before the Deputy Commissioner, Plaintiff was forty-four (44) years of age. Plaintiff has an eleventh (11th) grade education and his prior work experience includes working as a fisherman and as a carpenter. Plaintiff worked for Defendant-Employer as a carpenter.
2. On 11 April 1997, Plaintiff sustained an admittedly compensable injury to his back arising out of and in the course of his employment with Defendant-Employer, when he fell from construction scaffolding at a height of ten (10) feet.
3. Plaintiff underwent a C6-7 anterior cervical discectomy and inner body fusion on 10 June 1997, and C4-5 and C5-6 anterior cervical microsurgical discectomies and fusion on 23 June 1998.
4. Dr. Randall Sherman was the authorized treating physician for Plaintiff. He gave a thirty percent (30%) permanent partial impairment rating to Plaintiff's back and indicated that Plaintiff continued to be disabled and would not be able to return to heavy construction work. Dr. Sherman has since left the practice.
5. Dr. Warren Foer saw Plaintiff for an independent medical examination (IME) on 1 July 1999. Dr. Foer agreed with Dr. Sherman's diagnosis but assigned a permanent partial impairment rating of twelve percent (12%) to Plaintiff's back and noted that Plaintiff was at maximum medical improvement.
6. The Full Commission gives greater weight to the thirty percent (30%) permanent partial impairment rating to Plaintiff's back given by Dr. Sherman.
7. Plaintiff was subsequently seen by Dr. Theodore Nicholas, who issued work restrictions of no lifting, pushing, or pulling over twenty (20) pounds; no prolonged reaching overhead; and limited use of the right extremity effective 2 April 2002. Plaintiff was thereafter provided vocational rehabilitation through Southern Rehabilitation Network, Inc., on 10 June 2002.
8. Ms. Vickie Dixon is a Vocational Case Manager with Southern Rehabilitation Network, Inc. Ms. Dixon has a Bachelor's Degree in Psychology and a Master's Degree in Rehabilitation Counseling and Evaluation. Ms. Dixon is also a Certified Rehabilitation Counselor and Licensed Professional Counselor. Ms. Dixon has worked in the field of vocational rehabilitation since 1995, and has handled approximately two hundred to three hundred (200 to 300) cases during her ten years of practice in the field of vocational rehabilitation.
9. Ms. Dixon testified regarding how the vocational rehabilitation process works in a typical workers' compensation case. Specifically, Ms. Dixon first receives a referral from the home office located in Raleigh, North Carolina. Ms. Dixon then contacts the claimant or attorney and schedules an initial joint meeting or obtains authorization to contact the injured worker independently. Ms. Dixon then performs an initial assessment covering the claimant's medical status, educational background, work history, transferable skills, interest inventory, career exploration, as well as discusses a vocational rehabilitation plan and goals to target. Ms. Dixon utilizes an individualized vocational plan pursuant to the North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims.
10. Plaintiff's vocational rehabilitation case was transferred to Ms. Dixon in March 2003, following an initial case assessment that was performed by another rehabilitation professional with Southern Rehabilitation Network, Inc. Ms. Dixon first met with Plaintiff in June 2003, at the Kill Devil Hills' Public Library. At that time, Ms. Dixon reviewed Plaintiff's medical information and advised Plaintiff about the purpose of the vocational rehabilitation process. Plaintiff indicated to Ms. Dixon that he was working as a commercial fisherman at the time, and his case was placed on hold.
11. Ms. Dixon re-opened Plaintiff's case in January 2004, and prepared a vocational rehabilitation plan. Based on Plaintiff's medical restrictions and transferable skills, Ms. Dixon recommended entry-level, light-duty clerk positions as potential job opportunities. Ms. Dixon thereafter resumed vocational services and began targeting light-duty jobs for Plaintiff. Ms. Dixon utilized the Dictionary of Occupational Titles as a reference for job opportunities.
12. Defendants contend that Plaintiff was non-compliant with vocational rehabilitation in that he missed a number of appointments and that he unjustifiably refused suitable employment. Defendants filed a motion with the Commission on 1 September 2004, seeking an order directing Plaintiff to comply with vocational rehabilitation. On 19 October 2004, Executive Secretary Tracey Weaver issued an Order compelling Plaintiff to comply with future reasonable vocational rehabilitation services provided by Defendants.
13. Defendants contend that despite the 19 October 2004 Order, Plaintiff remained non-compliant with vocational rehabilitation. Defendants filed a Form 24 application on 18 January 2005, requesting that the Commission suspend Plaintiff's benefits as a result of his continued non-compliance with vocational rehabilitation. Defendants' "Motion in Support of Form 24," alleged that "[Plaintiff] has consistently failed to cooperate with vocational rehabilitation since issuance of the order from the Industrial Commission. [Plaintiff] has missed appointments and has outright stated he did not feel he could physically do any of the jobs he was being directed to look at."
14. By Order dated 22 March 2005, a Special Deputy Commissioner approved Defendants' Form 24 application and allowed Defendants to suspend Plaintiff's benefits effective 18 January 2005. The Special Deputy Commissioner stated that the evidence before her showed that Plaintiff missed two (2) meetings on 7 December 2004, and 4 January 2005. She further found that "Plaintiff was obligated to attend the meetings or provide a justification for his failure to do so and was unjustified in his refusal to do so." The Special Deputy Commissioner awarded Defendants a credit for overpayment as a result of benefits paid between the filing of Defendants' Form 24 application and the 22 March 2005 Order. Plaintiff filed a Form 33 request for hearing appealing the approval of Defendants' Form 24 application and challenging the calculation of his average weekly wage and corresponding compensation rate.
15. Plaintiff and Ms. Dixon have had a strained relationship, and Plaintiff has directed at least one angry outburst towards her. Plaintiff thereafter apologized for his behavior and indicated to her that he would comply with her vocational recommendations.
16. Ms. Dixon provided Plaintiff with several job leads including a security gate guard and cashier position, a sales clerk position, a stocker position with a grocery store, a route driver, an armed security officer and a position as a photo technician.
17. Some of the jobs to which Ms. Dixon referred Plaintiff were not suitable for him. For example, based upon the communication skills Plaintiff exhibited at the hearing before the Deputy Commissioner, he would need interpersonal skills training before accepting employment in the customer service field; and therefore, is not suited to work as a sales associate at a women's shoe store, even though this is one job opportunity to which he was directed. Plaintiff was also sent a job lead for an armed security officer position even though Ms. Dixon knew Plaintiff has a criminal record. Based upon Plaintiff's criminal record, the Full Commission finds that it is unlikely Plaintiff would have been offered the job.
18. The evidence of record does not reflect that a job description was presented to, or approved by a doctor for any of the jobs opportunities presented to Plaintiff through vocational rehabilitation. Although a physician cleared Plaintiff to work with restrictions, the record reveals that there were no suitable jobs available to Plaintiff.
19. Plaintiff met with Ms. Dixon on multiple occasions and has made attempts to find work. Plaintiff testified that he travels approximately sixty (60) miles, one way, to meet with Ms. Dixon and that his financial circumstances severely limit his ability to travel to meet with Ms. Dixon and to search for suitable employment. Ms. Dixon testified that Plaintiff told her he only lived six (6) miles away from the meeting place and never mentioned financial difficulties. The Full Commission adopts the finding of fact of the Deputy Commissioner on this credibility issue and finds Plaintiff's testimony on this issue to be credible. Plaintiff's failure to attend those appointments he missed with Ms. Dixon was justifiable and reasonable.
20. At the time of hearing before the Deputy Commissioner, Plaintiff was forty-four (44) years of age, had an eleventh (11th) grade education. Plaintiff has no transferable vocational skills. His prior work experience is as a fisherman and carpenter. Ms. Dixon testified that she performs an initial assessment covering the claimant's medical status, educational background, work history, transferable skills, interest inventory, career exploration; and developed an individualized work plan based on the information gathered. However, Ms. Dixon testified that she wrongly believed Plaintiff had a high school diploma. Her misunderstanding of this crucial fact would have made it difficult for her to identify suitable employment. Plaintiff should have been referred to employment in the local labor market or self-employment which is reasonably attainable and which offers an opportunity to restore him as soon as possible and as nearly as practicable to his pre-injury wage, while giving due consideration to his qualifications including age, education, work experience, physical and mental capacities, impairment, vocational interests, and aptitudes. Pursuing many of the job leads Defendants provided Plaintiff would have been futile and his inaction with regard to these job leads was justifiable and reasonable.
21. Although Plaintiff did not comply with all of the vocational rehabilitation directives of Ms. Dixon, Plaintiff has substantially complied with the reasonable vocational rehabilitation services made available to him. The Special Deputy Commissioner found that Plaintiff missed two (2) appointments with Ms. Dixon on 7 December 2004, and 4 January 2005. Plaintiff testified and the Full Commission finds credible, however, that Plaintiff missed these meetings either due to illness or transportation problems, Therefore, the Special Deputy Commissioner improvidently granted the Form 24 application filed 22 March 2005.
22. The Defendant-generated Form 19 filed in this matter lists Plaintiff's pay rate as "$300" per "other" with "7" days worked per week. The Form 63 lists Plaintiff's average weekly wage as $100.00. On the Form 18, Plaintiff listed his average weekly wage as $200.00.
23. Plaintiff worked part-time for Defendant-Employer at a rate of $10.00 per hour.
24. Plaintiff was injured on the first day of his third week working for Defendant-Employer. Plaintiff earned $280.00 in his first week and $180.00 in his second week. All of this money was paid to Plaintiff in cash "under the table."
25. After Plaintiff was injured on the first day of his third week, Defendant-Employer paid Plaintiff $100.00 in a check as well as $25.00 in cash. The $100.00 average weekly wage Defendants used on the Form 63 appears to be derived from this $100.00 check for Plaintiff's "third week." Plaintiff did not work a full day on the day he was injured.
26. The Full Commission has considered all five methods for calculating average weekly wages set forth in N.C. Gen. Stat. § 97-2(5), and finds the fifth method to be fair and just. The first method would not be fair and just as Plaintiff worked less than fifty-two (52) weeks immediately preceding his injury. The second method would not be fair and just as it applies to an employee who has worked fifty-two (52) weeks, but missed more than seven (7) consecutive days during that period. The third method calculates the average weekly wage of employees who worked less than fifty-two (52) weeks by dividing the actual earnings by the number of weeks worked, provided the results are fair and just to both parties. Since Plaintiff's "third week" was actually less than a day, for which Plaintiff was paid at a rate over twice his normal hourly rate it would be unfair and unjust to the parties to count the $125.00 that Plaintiff earned for this partial day as either a day or as a week. The fourth method is inappropriate because there has been no presentation of evidence regarding the earnings of an employee "of the same grade and character employed in the same class of employment in the same locality or community" as Plaintiff. The fifth method of calculation would most nearly approximate what Plaintiff would be earning had he not been injured and is fair and just to both parties.
27. Since Plaintiff only worked during two (2) full weeks for Defendant-Employer, earning $280.00 one week and $180.00 the other, a fair and just average weekly wage is derived using the fifth method by adding Plaintiff's earnings in these weeks and dividing by two (2), yielding an average weekly wage of $230.00.
28. From the date of injury through the date of the filing of Defendants' Form 24, Defendants have paid to Plaintiff temporary total disability benefits at a weekly compensation rate of $66.67. There has been an underpayment in temporary total disability benefits. Plaintiff sent a letter to Defendant-Carrier dated 8 April 1998, identifying an underpayment.
29. Defendants contend Plaintiff is estopped from challenging his average weekly wage calculation at this stage in the proceeding. Defendants filed a Form 63, payment without prejudice to later deny the claim, giving an incorrect average weekly wage. Plaintiff is not bound by Defendants incorrect calculation of average weekly wage. A Form 63 is not a stipulation of the parties. The Full Commission has the authority to correct errors and recalculate Plaintiff's average weekly wage at any stage of the proceeding. The Full Commission has an obligation to determine all questions arising under the Workers' Compensation Act, including average weekly wage.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-2(5), establishes an order of preference for the calculation of average weekly wage. The primary method for determining average weekly wage is to divide by fifty-two (52) the total wages the employee earned for the fifty-two (52) weeks preceding the date of the injury. Bond v. Foster Masonry, Inc., 139 N.C. App. 123,532 S.E.2d 583 (2000). In cases in which the preferred first method under N.C. Gen. Stat. § 97-2(5) is not fair and just, the statute provides additional methods to use in the calculation of a worker's average weekly wage.
2. In this case, the first method is not fair and just as Plaintiff worked less than fifty-two (52) weeks immediately preceding his injury. The second method is not fair and just as it applies to an employee who has worked fifty-two (52) weeks, but missed more than seven (7) consecutive days during that period. The third method applies to employees who worked less than fifty-two (52) weeks by calculating their average weekly wage by dividing the actual earnings by the number of weeks worked, provided the results are fair and just to both parties. In this case, the Plaintiff's "third week" was actually less than a day, for which Plaintiff was paid at a rate over twice his normal hourly rate. It would be unfair and unjust to each party respectively to consider the $125.00, Plaintiff earned for this partial day as either a day or as a week. Therefore this method is not appropriate. The fourth method is inappropriate because there has been no presentation of evidence regarding the earnings of an employee "of the same grade and character employed in the same class of employment in the same locality or community." Therefore in this matter it is fair and just to both parties to use the fifth method to compute Plaintiff's average weekly wage because it most nearly approximates the wages Plaintiff would be earning were it not for the injury. N.C. Gen. Stat. § 97-2(5).
3. In this case, the application of the fifth method of calculation under N.C. Gen. Stat. § 97-2(5), together with the greater weight of the evidence regarding Plaintiff's earnings while working for Defendant-Employer, results in an average weekly wage of $230.00, which results in a workers' compensation rate of $153.34. This average weekly wage is arrived at by adding Plaintiff's earnings in his first two (2) weeks ($280.00 and $180.00) and dividing by two (2). N.C. Gen. Stat. § 97-2(5). 4. Defendants contend that Plaintiff is estopped from challenging the calculation of his average weekly wage at this stage in the proceeding. Determination of a claimant's average weekly wages, for purposes of awarding benefits, raises an issue of law, to be decided by the Commission. Boney v. Winn Dixie, Inc., 163 N.C. App. 330,593 S.E.2d 93 (2004). The Commission shall determine all questions arising under the Workers' Compensation Act, if not settled by agreement of the parties with the approval of the Commission. N.C. Gen. Stat. § 97-91. Pursuant to N.C. Gen. Stat. § 97-91, the Commission has an obligation to determine Plaintiff's average weekly wage as this issue was raised by Plaintiff and not previously settled by agreement of the parties and approved by the Commission.
5. Refusal of the employee to accept any medical, hospital, surgical, or other treatment or rehabilitative procedure when ordered by the Commission ordinarily shall bar said employee from further compensation until such refusal ceases. N.C. Gen. Stat § 97-25; Sanhueza v. LibertySteel Erectors, 122 N.C. App. 603, 471 S.E.2d 92 (1996). However, in this instance Defendants have failed to prove by the greater weight of the evidence that Plaintiff failed to cooperate with reasonable vocational rehabilitation services in order to justify suspension or termination of Plaintiff's workers' compensation benefits. Plaintiff's search for jobs that he could not perform, even if offered, would not lessen his disability, effect a cure, or provide relief. Therefore, under the circumstances of this case, Plaintiff did not fail to abide by the Order of the Executive Secretary, which ordered him to comply with reasonable vocational rehabilitation offered by Defendants and he did not violate N.C. Gen. Stat. § 97-25. Also, Plaintiff had a reasonable excuse for not attending all of his scheduled meetings with the vocational rehabilitation professional.
6. Defendants failed to meet their burden of presenting sufficient evidence in support of their Form 24 application to suspend or terminate Plaintiff's temporary total disability benefits. Bowen v. ABF FreightSystems, Inc., ___ N.C. App. ___, 633 S.E.2d 854 (2006).
7. The Special Deputy Commissioner improvidently granted the Form 24 application filed 22 March 2005. N.C. Gen. Stat. § 97-18.1.
8. Plaintiff remains under Order to cooperate with and to comply with Defendants' efforts to assist him in finding suitable employment. N.C. Gen. Stat. § 97-25.
9. Due to his continued disability as a result of his compensable injury, Plaintiff is entitled to temporary total disability payments at a rate of $153.34 per week from the date of injury through the date of the hearing before the Deputy Commissioner and continuing until further order of the Commission. Plaintiff is entitled to a lump sum payment of the additional compensation due him for the underpayment of his compensation rate. N.C. Gen. Stat. § 97-29.
10. Defendants are obligated to continue to pay all medical expenses incurred or to be incurred in the future which are reasonably related to Plaintiff's compensable injury and which tend to effect a cure, provide relief and/or lessen his disability. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based on the foregoing Stipulations, Findings of Fact and Conclusions of Law the Full Commission enters the following:
 AWARD
1. Defendants shall resume payment of temporary total disability to Plaintiff in the weekly amount of $153.34, beginning on the date on which compensation was suspended and continuing until further Order of the Commission. Those payments that have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Defendants shall pay to Plaintiff a lump sum for the additional compensation due to him for the underpayment of his compensation rate since the date of injury.
3. Defendants shall pay all medical expenses incurred or to be incurred in the future which are reasonably related to Plaintiff's compensable injury when bills have been approved according to procedures adopted by the Commission.
4. Plaintiff shall cooperate with Defendants' reasonable efforts to assist him in finding suitable employment.
5. A reasonable attorney's fee of twenty-five percent of the compensation awarded in paragraphs 1 and 2 is hereby approved for Plaintiff's counsel. The accrued portion of this fee shall be deducted from the accrued benefits and paid directly to Plaintiff's counsel. Thereafter, Plaintiff's attorney shall receive every fourth compensation check from the temporary total disability compensation due Plaintiff.
6. Defendants shall pay the costs.
This the ___ day of October 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
 S/___________________ BUCK LATTIMORE CHAIRMAN